UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TERESA TREAT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: 1:13-cv-0002-SEB-DML |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Teresa Treat seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.

For the reasons detailed below, the Commissioner's decision is AFFIRMED.

## Administrative Proceedings

Ms. Treat applied for DIB on January 15, 2010, and alleged that her disability began on December 23, 2009. (R. 152). Her application was denied initially and after reconsideration, and an administrative hearing was held on May 12, 2011, before Administrative Law Judge Angela Miranda. She issued a decision on September 23, 2011, that Ms. Treat was not disabled at any time from her alleged onset date through the date of the administrative decision. She found that Ms. Treat was capable of a range of sedentary work and "[m]entally . . .has the capacity to understand, remember, and carry out simple, routine tasks." (R. 24).

With this residual functional capacity and based on the testimony of a vocational expert, the ALJ concluded that a significant number of jobs were available to Ms. Treat as either a charge account clerk (DOT # 205.367-014) or eyeglass assembler (DOT # 713.687-026). The Appeals Council denied Ms. Treat's request for review on November 7, 2012, making the ALJ's disability determination the final decision of the Commissioner. *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). Ms. Treat timely filed this action for judicial review of the Commissioner's final decision.

## Applicable Standards

To be eligible for disability benefits under the Social Security Act, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). There must be medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques," and disability may not be adjudged only by a claimant's description of her symptoms. 20 C.F.R. § 404.1508.

The Social Security Administration has prescribed a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520(a)(4). The first step inquires whether the claimant is engaged in substantially gainful activity. If she is not, the second step inquires whether the claimant suffers from any severe

impairment, which is an impairment that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If there is at least one severe impairment, then step three compares the claimant's impairments, singly or in combination, to medical conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, which are defined by criteria that the Administration has pre-determined are disabling. If the claimant's impairments meet or medically equal in severity the requirements of a listing, then the claimant is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity ("RFC") is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled. 20 C.F.R. § 404.1520(f). If she cannot perform her past work, the analysis proceeds to the fifth and final step, at which the claimant's age, work experience, education, and RFC are evaluated to determine whether she is capable of performing any other work available in the relevant economy. 20 C.F.R. § 404.1520(g). The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005).

The task a court faces in a case like this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the

Commissioner's decision is supported by substantial evidence and is otherwise free of legal error. *Kendrick v. Shalala,* 988 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)). We must give the Commissioner's (ALJ's) decision a commonsense reading while at the same time ensure that we can discern the path of her reasoning. *See Diaz v. Chater,* 50 F.3d 300, 307 (7th Cir. 1995) (ALJ's analysis must allow the court to "trace the path of his reasoning.").

## Analysis

Ms. Treat raises three issues. She contends that the ALJ erred by (a) failing to give appropriate weight to an opinion of her primary care physician regarding her functional abilities; (b) failing to evaluate her mental impairments properly; and (c) failing to determine that she is illiterate.

We will first summarize the ALJ's step five sequential findings and then address each of Ms. Treat's grounds for reversal and remand of the Commissioner's decision that she is not disabled.

I. **The ALJ's Sequential Findings**

Ms. Treat was born in 1966 and was 43 years old on the alleged onset date of her disability in 2009 and 45 years old at the time of the ALJ's decision. Ms. Treat dropped out of school in the 8th grade and had been in special education classes during her elementary years. (R. 52). She had worked in a factory from January

4

1994 through December 2009 as a general laborer packaging chains. (R. 423). Her alleged disability onset date of December 23, 2009, coincides with the diagnosis and surgical treatment of dysfunction in the toes of her left foot.

At step one, the ALJ found that Ms. Treat had not engaged in substantial gainful activity since her onset date.

At step two, she found that Ms. Treat suffered from the following severe physical impairments: the residual effects from breast cancer surgery and treatment; left foot dysfunction from effects of remote surgical fusion to her left ankle, recent surgical correction of hammer toes on her left foot, degenerative changes to the metatarsophalangeal joint of the big toe on her left, and plantar fasciitis. She also identified severe mental impairments that had been variously diagnosed as major depressive disorder, panic with agoraphobia, generalized anxiety disorder, bipolar disorder, and seasonal affective disorder. (R. 21). The ALJ found that despite Ms. Treat's complaint that she suffered from carpal tunnel syndrome, it was not a medically-determined impairment because of the absence of supporting clinical examinations or diagnostic findings. *See* 20 C.F.R. 404.1508 ("A physical . . . impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings [and] not only by your statement of symptoms.")[1]

---

[1]   The ALJ also noted that the psychological consultative examiner's report contained a notation of "rule out borderline intellectual functioning." She found that this also was not a medically-determined impairment and noted that no IQ testing appears in the record. (R. 22). Ms. Treat contends that the ALJ could have ordered an IQ test and it was error that she did not. She does not explain, however,

5

At step three, the ALJ found that none of Ms. Treat's impairments, alone or in combination, met or medically equaled any listing.

For purposes of evaluating Ms. Treat's disability at steps four and five, the ALJ determined that Ms. Treat had the residual functional capacity to perform sedentary work (she can stand or walk up to a total of two hours in a work day and can sit for up to six hours in a work day) with some additional limitations on her postural abilities. The ALJ also determined that Ms. Treat's mental impairments limited her to simple and routine tasks. With this RFC, Ms. Treat could not perform her past relevant work as a general laborer in a factory, which had required a light level of exertion. At step five, and based on the testimony of a vocational expert, the ALJ found that Ms. Treat's capabilities and her vocational profile fit the requirements of charge account clerk and eyeglass assembler, which she found to exist in significant numbers within Indiana and nationally. Accordingly, the ALJ found that Ms. Treat was not disabled.

---

how an IQ test could assist deciding whether she is disabled. She suggests that an IQ test may determine whether she is illiterate, but cites nothing to show that IQ tests measure literacy. Moreover, Ms. Treat's lawyer at the hearing assured the ALJ that the administrative record was complete and there was no additional information that should be considered. A claimant who is represented by counsel is expected to put on her best case for benefits. *Glenn v. Sec'y of Health & Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987) (ALJ is entitled to assume that a claimant who is represented by counsel "is making his strongest case for benefits"). She cannot complain now about the lack of an IQ test when she never before suggested the record was incomplete without one.

## II. The ALJ's evaluation of the opinion of Ms. Treat's treating physician is supported by substantial evidence.

Ms. Treat contends that the ALJ erred in evaluating an opinion dated July 7, 2010, by her primary care doctor, Dr. Thomas Moran, regarding her functional abilities to engage in physical work activities. She argues that the ALJ erroneously failed to acknowledge Ms. Treat's lengthy and regular treatment relationship with Dr. Moran, and contends that it was erroneous for the ALJ to accord only "limited weight" to Dr. Moran's opinion. Dr. Moran stated that Ms. Treat can stand or walk less than two hours in a work day and sit less than six hours in a work day. Dr. Moran also reported that Ms. Treat is severely limited in pushing and pulling abilities, can never engage in any postural activities (no climbing, balancing, kneeling, crouching, crawling, or stooping), and can only occasionally use her hands for reaching, handling, and fingering. (R. 491-494). As support for his opinion, Dr. Moran stated that Ms. Treat has a "severe impairment of left lower extremity" and "tendonitis in both upper extremities." (*Id.*).

A medical opinion by a treating physician about the nature and severity of a claimant's impairments, including any resulting mental or physical restrictions, is entitled to "controlling weight" if it is well-supported by objective medical evidence and is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011) ("[T]reating physician's opinion is entitled to controlling weight only if it is not inconsistent with other substantial evidence in the record.") If a treating physician's opinion is not entitled to controlling weight, it still must be evaluated using the same factors relevant to

7

weighing other medical opinions. That is, the ALJ decides the weight to accord it based on the degree to which the medical opinion (a) is supported by relevant evidence and explanations; (b) considered all evidence pertinent to the claimant's claim: (c) is consistent with the record as a whole; and (d) is supported or contradicted by any other factors. *Id.* § 404.1527(c)(3)-(6). The physician's field of specialty and the nature and extent of her treatment relationship with the claimant are also considered. *Id.* § 404.1527(c)(2)(i) and (c)(2)(ii).

The ALJ gave only limited weight to Dr. Moran's opinions regarding Ms. Treat's functional abilities because, in her view, they were not supported by Dr. Moran's own clinical findings, were not consistent with the findings of Ms. Treat's other treating sources, and were not supported by any objective findings such as a functional capacity evaluation. (R. 29). The ALJ's decision reflects substantial evidentiary support for these conclusions. She addressed Dr. Moran's lengthy treating relationship with Ms. Treat by acknowledging that he was her primary care physician and by discussing Ms. Treat's near-monthly visits to Dr. Moran. The ALJ referenced Dr. Moran's notations at virtually every visit of Ms. Treat's complaints of foot pain (despite his findings that she was "neurologically intact") and anxiety and depression. She contrasted those complaints against the facts that Dr. Moran's records contained essentially no clinical findings regarding Ms. Treat's foot dysfunction and that the doctor who actually treated the claimant for her foot and toes dysfunction was Dr. Woo, Ms. Treat's orthopedist, who like Dr. Moran was a treating medical source.

Dr. Woo's treatment notes showed, in February 2010, that Ms. Treat's condition had greatly improved since her December 2009 surgery. Indeed, Ms. Treat reported to the Social Security Administration that her doctors had released her to return to work at a "sit down job" as of February 28, 2010, but her company did not have any such jobs available. (R. 26, 185). Two months later, in April 2010, Ms. Treat told Dr. Woo that she had dropped a heavy object on her surgically repaired toes. At that time, Dr. Woo's physical evaluation and x-rays indicated that Ms. Treat could well tolerate ankle flexion and extension and that the toes on her left foot showed excellent alignment. Dr. Woo stated that Ms. Treat probably needed "up to a couple of months" before going back to work fully and that she could return for another patient visit in six to eight weeks "before her intended return [to work] later this spring." (R. 338). Ms. Treat did not return to her factory job, and she did not return to Dr. Woo. In making her finding that Ms. Treat's physical impairments could reasonably be accommodated by limiting her to sedentary work, the ALJ took into account Dr. Woo's clinical findings and functional opinions and weighed them with the other evidence, including Ms. Treat's continuing complaints of foot pain and mobility issues because of that pain.

With respect to Dr. Moran's indication that Ms. Treat's tendonitis supported his opinion that Ms. Treat had manipulative limitations (reaching, handling, fingering), the ALJ had noted that the record evidence of problems with Ms. Treat's hands consisted solely of her complaints to Dr. Moran and that there was no clinical or diagnostic examination to support the existence of such an impairment. (R. 22).

Ms. Treat has not challenged the ALJ's determination that the medical evidence failed to establish the existence of a physical impairment in her hands.

In sum, the ALJ provided reasoned support for her determination that Dr. Moran's opinions were entitled to limited weight because of the relative lack of clinical findings in his records to support them and because the specialist who treated Ms. Treat's foot and toes indicated that Ms. Treat had far greater capabilities, even though Ms. Treat never reached the point where she could continue to work at her factory job. We cannot reweigh the evidence.

### III. The ALJ's evaluation of Ms. Treat's mental impairments is supported by substantial evidence.

Ms. Treat's disagreements with the ALJ's evaluation of her mental impairments are also unavailing under our standard of review. She contends that the ALJ should have found that her mental impairments caused more problems than the ALJ determined, but we must defer to the ALJ's weighing of the evidence and affirm her findings so long as they have reasoned support. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (court may not reweigh evidence or resolve conflicts in the evidence but must accept the ALJ's factual findings when they are supported by evidence that a reasonable person would find adequate to support the findings).

Mental impairments are evaluated at three steps of the sequential process. At step two (determining whether a mental impairment is severe) and at step three (determining whether a mental impairment is of such severity that the claimant is presumptively disabled), the ALJ examines the "degree of functional limitation"

caused by the impairments by examining the claimant's functioning in four broad areas: activities of daily living; social functioning; concentration, persistence, and pace ("CPP"); and episodes of decompensation. There are five possible rates for the first three, and their range is: none, mild, moderate, marked, and extreme. For episodes of decompensation, the range, also in increasing severity is: (a) none; (b) one to two; (c) three; and (d) four or more. 20 C.F.R. 404.1520a(b), (c).

The ALJ decided that Ms. Treat's mental impairments caused mild restrictions in Ms. Treat's daily living activities and social functioning and moderate difficulties in CPP. She also found that Ms. Treat had suffered no episodes of decompensation of extended duration. These findings—that Ms. Treat had moderate difficulties in at least one area, but no marked difficulties in any area—meant that although Ms. Treat's mental impairments were severe (the step two finding), she was not presumptively disabled by them (the step three finding). Ms. Treat does not purport to challenge either of these conclusions. Instead, she contends that when the ALJ evaluated the effects of her mental impairments on her work capacity for purposes of deciding her RFC, the ALJ minimized her abilities. She contends that her daily living activities, social functioning, and CPP functioning were much more restricted than the ALJ found them to be.

When evaluating daily living activities, the ALJ considers whether a claimant's mental impairments cause difficulties in doing things such as cleaning, shopping, cooking, maintaining a residence, and self-grooming and hygiene. Listing 12.00(C)(1). The ALJ cited evidence that Ms. Treat uses the microwave to cook

11

things, watches her grandchildren, spends time tanning, and does not need assistance or reminders for her personal care. She also cited evidence that Ms. Treat's difficulties with some daily household chores were attributable to physical impairments and not mental ones. Her decision, based on weighing this evidence, that Ms. Treat's daily living activities are only mildly affected by her mental impairments withstands our scrutiny.

Social functioning examines how the claimant gets along with others, including family members, friends, neighbors, co-workers, shopkeepers, and strangers. Listing 12.00(C)(2). Here, the ALJ weighed evidence indicating difficulties with social functioning with evidence indicating ease in social situations. She addressed Ms. Treat's testimony regarding frequent panic attacks and a lack of friends, but also noted that Ms. Treat socializes with her mother and daughter, talks on the phone weekly to one friend, watches her grandchildren, was cooperative with her treating physicians, and reported on a disability form that she does not mind being around groups of people. She also referenced a trip to Disney World and listed Ms. Treat's attendance at her daughter's prom as indicative of positive social functioning.

Ms. Treat takes issue with the ALJ's observations that she went to her daughter's prom and that she went to Disney World. As to the former, she complains that she had a panic attack there, and as to the latter, that the evidence shows she told a psychologist that she felt happy because her daughter bought her a ticket to Disney World, and there is no evidence that she actually went to Disney

World. (But she does not deny that she did so.) Whether or not she actually went to Disney World is really beside the point. At the very least, both Ms. Treat and her daughter thought a trip to Disney World was appropriate for her. As to panic attacks, the ALJ cited evidence that Ms. Treat consistently told Dr. Moran that her symptoms were helped by medication (R. 27) and that her panic attacks (including at the prom) had increased because she had stopped taking her medication. (R. 28). Because the ALJ considered the relevant evidence and gave good reasons for weighing that evidence as she did, we have no basis for overturning the ALJ's assessment of Ms. Treat's socialization abilities in a work setting.

Finally, with respect to CPP, the ALJ determined that Ms. Treat did need a work accommodation and limited her to simple and routine tasks, finding that she has the capacity to understand, remember, and carry out simple, routine tasks. (R. 24). The ALJ took into account that Ms. Treat engages in some activities that require sustained concentration, such as working on jigsaw puzzles for two to three hours, babysitting grandchildren, and writing in a journal, but she also considered that Ms. Treat suffers from pain that can interfere with her abilities to concentrate and persist. Ms. Treat protests that the ALJ did not more deeply inquire about Ms. Treat's pace in putting together jigsaw puzzles and that even though she writes in a journal, she finds the task difficult because of her low reading and writing abilities. Neither of these issues detracts, however, from the fact that Ms. Treat can and does work on jigsaw puzzles for lengthy periods and can and does work on her journal every day, thus indicating (or at least it was reasonable for the ALJ to conclude)

that despite Ms. Treat's mental impairments and her pain symptoms, she has the capacity to concentrate and persist on tasks on a sustained basis.

In sum, sufficient evidence supports the ALJ's evaluation of Ms. Treat's mental impairments and their limiting effects in formulating the RFC.[2]

## IV. The ALJ's determination that the evidence does not support a finding of illiteracy is supported by substantial evidence.

Ms. Treat's final assertion of error is that "Mrs. Treat's poor verbal skills would affect what jobs she is capable of performing beyond just simple, routine tasks. Unskilled work can still require literacy." (Dkt. 16 at p. 21). She cites Ms. Treat's testimony that although she can read simple words, she cannot read the newspaper, does not read books or magazines, has trouble following recipes and relies on pictures for cooking instructions, seeks help from her daughter with spelling when she writes in her journal, and needed her daughter to complete the disability application for her. She contends that the ALJ erred by not addressing "Mrs. Treat's limited education and illiteracy . . . in her RFC." (*Id.* at 17). Again,

---

[2] Ms. Treat also complains that the ALJ did not make any accommodations within the RFC based on the side-effects of her medication. She testified that her medications make her nauseous and make her sleep 16 hours a day. The ALJ addressed that Ms. Treat's family doctor (Dr. Moran) and a psychologist to whom Dr. Moran referred Ms. Treat (Dr. Deal) were working on managing her medication. Ms. Treat told Dr. Deal that Geodon and Requip were making her nauseous but she did not report any other side-effects of her medication. Dr. Deal stopped the Requip but restarted Ms. Treat on Geodon. Ms. Treat had taken Xanax since before her disability onset date—and thus while she was working. (R. 27). Thus, the ALJ evaluated Ms. Treat's medications and was not required to believe that Ms. Treat's medication cause constant nausea or cause her to sleep 16 hours every day. The ALJ provided numerous examples of activities that Ms. Treat actually engages in or had intended to engage in (going to Disney World, watching grandchildren, tanning, regular doctor's appointments), that are incompatible with sleeping 16 hours per day or dysfunction from nausea.

however, Ms. Treat is asking the court to reweigh the evidence.[3] The ALJ specifically addressed literacy and said the following:

> Of note, the record notes some limited reading ability, but does not establish illiteracy per the regulations. At the hearing, the claimant testified that she can read small words and can read a grocery list as well as instructions written on a piece of paper. The claimant also testified that she can write and writes in her journal daily.

(R. 30).

Illiteracy may substantially erode the availability of jobs, even to persons who are qualified only for unskilled work. Thus, if a person is illiterate, a vocational expert must take that into account in determining jobs available to a person who fits the claimant's vocational profile. Under the Medical-Vocational Guidelines (or the "Grids"), a finding of disability is required for persons who are aged 45-49, illiterate, and limited to unskilled work. (*See* Grid 201.17, Medical-Vocational Guidelines, Part 404, Subpart P, App. 2). Ms. Treat was born on March 15, 1966, and turned 45 years old on March 15, 2011—about six months before the date of the ALJ's decision. For a person who is 44 years old or younger (the category in which Ms. Treat belonged from her disability onset date through March 2011), illiteracy does not require a finding of disability. The Social Security regulations state that for persons in this age category, illiteracy generally does not substantially erode available unskilled work because "the bulk of unskilled work

---

[3] Ms. Treat also misstates some evidence. In her reply brief, Ms. Treat contends that the ALJ erred by not considering a diagnosis of "illiteracy" by Dr. Brandi Rudolph, the consultative psychiatrist. Dr. Rudolf did not test Ms. Treat's reading abilities. She reported Ms. Treat's statements that "she has a hard time reading and writing," and that "she cannot read," and Ms. Treat's characterization of herself as illiterate. (R. 333-35).

relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy . . . has the least significance." *See* Medical-Vocational Guidelines, Part 404, Subpart P, App. 2, § 201.00(i).

In *Glenn v. Sec'y of Health and Human Services,* 814 F.2d 387 (7th Cir. 1987), the court stressed that determination of literacy is a "highly fact-bound question" and a claimant "need only be able to read and write well enough to be able to hold simple, unskilled jobs." *Id.* at 391. If the ALJ supports her finding of literacy with substantial evidence, a court may not overturn it. *Id.* In *Glenn,* the ALJ did not elaborate on his conclusion that the claimant was literate. The record showed that the claimant could not read a newspaper or write a letter, could only pick out some written words, and could compose and write "only the simplest of messages." *Id.* Even with those very limited skills, the court upheld the ALJ's finding that the claimant was literate. Here, the ALJ determined that Ms. Treat was literate because she can read small words and a grocery list and has been able to write in a journal on a daily basis. (R. 30). Although Ms. Treat's journaling abilities apparently are extremely limited and frustrating to Ms. Treat, the fact that she can read and write simple things and did so regularly provides the modicum of evidentiary support constituting substantial evidence. *See Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001) (substantial evidence is more than a scintilla, but less than a preponderance of the evidence).

In her reply brief, Ms. Treat contends that her reading and writing skills at least are incompatible with the charge account clerk job the ALJ found that she

could do.  She argues too that the lens inserter job "*could* represent more than just the simple, routine tasks contemplated by the ALJ." (emphasis added: Dkt. 27 at p. 5).  These arguments should have been made by Ms. Treat in her opening brief so that the Commissioner had an opportunity to respond to them.  They are waived.  But even if Ms. Treat had not waived these arguments and even if we were to agree that the vocational requirements of a charge account clerk (which includes assisting customers in filling out applications for charge accounts) are incompatible with any reasonable view of Ms. Treat's abilities, the lens inserter job does not appear to require reading and writing abilities.  It is described in the DOT as a job requiring the worker to "fit lenses into plastic sunglass frames and place[s] frames on conveyor belt that passes under heat lamps which soften frames preparatory to setting of lenses."  DOT 713.687-026.  According to the ALJ, a significant number of these jobs are available—950 in Indiana and 300,000 nationally.  (R. 31).  Her step five decision that Ms. Treat is not disabled because her vocational profile and RFC are consistent with a significant number of available jobs is thus supported by substantial evidence.

## Conclusion

The court owes substantial deference to the Commissioner's evaluation of the evidence.  We cannot decide the facts anew, reweigh the evidence, or substitute our judgment for the Commissioner's.  Because the Commissioner's decision is based on a reasonable evaluation of the evidence, her decision is AFFIRMED.

IT IS SO ORDERED.

Date: 03/25/2014

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Distribution:**

**All ECF-registered counsel of record via email generated by the court's ECF system**